No. 6239.

J. W. Monk v. The State.

1. Practice—Qualifications of Jurors.—One of the disqualifications of a juror is that he has served as a juror in the district court for six days during the preceding six months. *Held*, that service as a juror for but *five* days is not a disqualification.

2. Murder—Indictment—Diligence—Evidence.—Allegation in an indictment for murder that the deceased was killed by a shot fired from a gun will admit proof that the fatal shot was fired from any kind of a fire arm. But in this case the indictment alleged that the deceased was shot and killed by the defendant "with a weapon to the grand jurors unknown." To prove the diligence of the grand jury to ascertain the character of the weapon used, the State asked the foreman of the grand jury: "What effort, if any, did you make to learn the manner and cause of the death of deceased, and what conclusion did you arrive at?" The witness replied as follows. "We had a great many witnesses before the grand jury, and we returned this indictment, which we thought was right." *Held* that the question was erroneously allowed, because upon the question ot diligence it was too broad and comprehensive, and was calculated to and did elicit an answer at once incompetent and prejudicial to the rights of the defendant.

3. Practice—Evidence.—The indictment having alleged that the deceased came to his death by being shot, it devolved upon the State to establish that fact by competent evidence. See the opinion for evidence admitted on the issue *held* incompetent because in part hearsay, and in part the opinion of a witness based upon investigation to which the defendant was not a party.

4. Murder—Fact Case.—See the statement of the case for evidence *held* insufficient to support a conviction for murder in the second degree.

Appeal from the District Court of Dallas. Tried below before the Hon. R. E. Burke.

The conviction in this case was in the second degree for the murder of C. Spears, in Dallas county, Texas, on the first day of November, 1887. The penalty assessed against the appellant was a term of five years in the penitentiary.

J. C. Crownover was the first witness for the State. He testified that he and Bruce Davis went hunting in the Rowlett creek bottom on the twenty-fifth day of November, 1887, and in the Bryant branch, which traversed that bottom, they found the remains of a man. The body was under a log in a hole

that had been washed out by the action of the water. It was partially covered by drift composed of trash and sticks. One log was pointing straight and the other was doubled to. There was a bullet hole through the skull. The witness saw that the body was that of Calvin Spears, a man whom he had seen but once alive, on which occasion he wore pants and boots corresponding with those found on the body. Calvin Spears had black hair and moustache, and the hair that showed upon the body was black. Decomposition was so far advanced that witness could make no satisfactory estimate of the size of the man in life, nor could he tell from the skeleton whether he was a white or black man. On his cross examination the witness said that the one time he saw Calvin Spears in life was about six weeks before he found the remains in the Bryant branch. He saw the witness Anderson on the same day, but could not say now how Anderson was dressed on that day, nor could he remember how he was dressed himself on that day. Calvin Spears was a tall and slender man, measuring six feet or more in height.

Bruce Davis testified, for the State, substantially as did the witness Crownover, except that he expressed no opinion as to whose body it was that he and Crownover found, and he said nothing about ever having seen Spears in life. The coat exhibited in evidence was the coat found on the body. The pants found on the body were of striped material, the stripes running up and down, and not across or around.

J. H. Anderson testified, for the State, that he lived on Rowlett creek in Dallas county, Texas. He was acquainted with the defendant and W. C. Jump, and in October, 1887, knew a man named Calvin Spears. Defendant and Jump went to work for witness on his place on October 20, 1887, and quit on October 28, 1887. Spears worked on the same place for witness from October 22, 1887, until October 25, since when the witness had not seen him. He was frequently absent for short periods of time during the said three days. Defendant and Jump were brothers-in-law, but witness was unable to say whether or not Spears was related to either of them. The witness last saw Spears alive on October 25, 1887, when, in company with defendant and Jump, he left witness's place to go to Dallas. Spears and Jump each rode a sorrel pony and defendant rode a gray pony. Jump came back to the witness's place on the evening of that day,

and the defendant on the evening of the next day. The wit-
ness saw the body found in Bryant's branch, and recognized
the clothing on it as the clothing of Calvin Spears. The coat
exhibited on this trial was the coat worn by Spears when, with
defendant and Jump, he left witness's house on the morning
of October 25. He recognized the pants on the body by means
of a patch on the knee, which said patch had a selvige strip
through it. Spears's hair and moustache were dark, but not
black, and the hair and moustache on the body corresponded
with Spears's. Witness paid defendant on October 29 some-
thing over two dollars, balance due him on work. He came
back on the following Thursday and left again on Saturday,
about an hour before sunset. Witness asked him as he left
which way he was going, and he replied: "The way my
wagon tongue points when I start." The witness lived on the
north side of the Rockwall road. H. C. Mills lived four and
a half miles north from witness's house. Rose Hill was about
a quarter of a mile south from witness's house. The body was
found about half a mile above the bridge that spanned Row-
lett's creek. Spears had a thirty-eight calibre pistol at defend-
ant's camp on one occasion.

On cross examination, the witness said that he could not re-
member which of the three men, when they left his house on
October 25, told him they were going to Dallas. Spears was a
man of medium stature, heavy set, and would weigh about
one hundred and fifty pounds. He worked for witness on wit-
ness's place, but lived at defendant's camp, about two hundred
yards distant from witness's house. Defendant's mother, broth-
ers and sisters, one of the sisters being Jump's wife, with Jump,
defendant and Spears, lived in that camp. Spears and defend-
ant each owned a horse, and Mrs. Monk, defendant's mother,
owned four horses and two colts, all of them being kept at the
camp. Dallas was southwest from witness's house. Garland
was northwest. The body was found north of witness's house.
When defendant returned to witness's house, after leaving it
with Jump and Spears on October 25, he told witness that
Spears was in Dallas trading horses.

W. M. Porter testified, for the State, that defendant, Jump
and Spears worked for him a few days early in October, 1887.
From the witness's place Spears went to Adams's place to
work, and defendant and Jump went to Anderson's. The wit-
ness never saw Spears exhibit any money in the presence of

the defendant, but on one occasion, when defendant was not present, he saw him with about one hundred dollars in currency. The coat exhibited, which the witness knew to be the one taken from the body found in Bryant's branch, was the identical coat worn by Spears when he worked for witness. Witness knew it by the lining of the pockets being of different colors. Witness often saw the said lining, as Spears carried whisky in a bottle that fitted so close in the pockets that always, when withdrawn, it would bring the lining out. Spears was a man of short stature, not above five and a half feet in height, was heavy set, and wore his hair cut short.

Thurston Anderson, the son of the witness J. H. Anderson, testified, for the State, that, three or four days before defendant, with Jump and Spears, left witness's father's house to go to Dallas, witness saw Spears with a roll of currency money. Defendant was present, but witness could not say whether he did or did not see the money.

J. C. Anderson testified, for the State, that he saw the body found in Bryant's branch, and by the clothes recognized it as the body of Calvin Spears. Witness met defendant in the town of Rose Hill some time in October, 1887, and tried to sell him some goods. He declined to buy upon the ground that he had bought Spears's pony and was "busted." Witness had seen Spears riding a small gray pony. Defendant did not say that he had *traded* for Spears's pony, but that he had *bought* it.

L. A. Adams testified, for the State, that defendant, Jump and a man named "Pierce" picked cotton for him in October, 1887. Defendant and Jump left witness's place and went to work for Anderson. About a week later Pierce quit working for witness and went to work for Anderson. Defendant, Jump and Pierce, on horseback, passed witness's house on the morning of October 25, 1887, when one of them told the witness that they were going to Dallas. Witness never saw Pierce afterward. The coat exhibited in evidence, which was the coat taken from the body found in Bryant's branch, was the coat worn by Pierce when he worked for the witness.

The witness stated, on cross examination, that no man giving the name of Spears worked for him in 1887.

Andrew Spillars testified, for the State, that in the fall of 1887,—he could not fix the month,—he saw the defendant sitting by the road side at the corner of his, witness's, fence. Defendant told witness, as witness passed him, "that he would meet

two parties riding sorrel ponies, and to tell them to "ride up." The witness met the two men described, riding towards Garland. They were then three and a half or four miles distant from Mills's house. On cross examination the witness said that he did not know either of the two men he met on the sorrel ponies, but thought one of them was W. C. Jump. From where the witness saw the parties to the place where the body was found, the distance was two and a half or three miles.

R. T. Little testified, for the State, that he saw the body found in Bryant's branch, and recognized it by the clothes as that of Calvin Spears. He identified the pants and boots. The witness last saw Spears alive on or about the morning of October 25, 1887, when he and W. C. Jump came to witness's house. Witness's said house was a little northwest from Anderson's, and about three miles from Mills's place. Spears on that occasion went with the witness into a stable where the witness kept a horse that was to run a race in November. Spears told witness that he was going to bet on witness's horse at that race.

H. C. Mills testified, for the State, that Jump and the defendant and another man came to his place about October, 25, 1887, and asked for directions to the place on which Grooms and Cockrell lived. They said they were hunting land to rent. Defendant was riding a gray, and the other two men sorrel ponies. The men went south, on leaving, until they got off witness's place, and then turned east toward the Grooms-Cockrell place. The body was found at a point south-east from witness's place. There was no road near where the body was found. There was a plain public road leading from witness's place to the Grooms-Cockrell place.

Silas Bryan testified, for the State, that, one morning, late in October, 1887, he met the defendant, his younger brother, and W. C. Jump, crossing a bridge which was about half a mile above the place where the body was subsequently found. They were going towards Anderson's, where they said they lived. They asked witness if he knew of any land to rent.

Will Cockrell testified, for the State, that late in October, 1887, he overtook defendant, Jump and another man, on the road going northeast from Anderson's, and east of Mills's place. They wanted to know if witness knew of anybody who had land to rent or cotton to be picked. Witness told them that he

had some cotton to be picked, and they promised to visit witness's place to examine it, but never came.

D. W. Houseley, postmaster at Rose Hill, testified for the State, that he frequently saw Calvin Spears during the two weeks he lived near Rose Hill. He saw the dead body found in Bryant's branch, and recognized the clothes on it as the clothes worn by Calvin Spears during the time that he knew said Spears.

The opinion sets out in full the testimony of justice of the peace Alexander as delivered on his examination in chief. On cross examination the witness said that the body was found in Bryant's branch about thirty feet from where it empties into Rowlett's creek. The said creek, when half full of water, overflowed the place where the body was found. Decomposition was very far advanced when the body was found. The head had rotted off, as had the arms and legs, which were held in place by the clothing, and which fell apart when moved. The bones of the head and face were bare, all of the skin and flesh having disappeared. The ground where the body was found was damp, and it was evident that water had run over the body since it was placed there.

Henry Leifester testified, for the State, that he was deputy sheriff of Mason county in 1887 and 1888. In January, 1888, he arrested the defendant while plowing in his uncle's field in Mason county. He was plowing a small sorrel horse branded S on the left shoulder. Mason county was about four hundred miles distant from Dallas. Defendant made no resistance, nor did he attempt to escape or to avoid arrest. The testimony of H. F. Ewing, the foreman of the grand jury which framed this bill of indictment, is set out in the opinion of the court. The State closed.

Dr. Wray, testifying for the defense as an expert, said that if the "body of a man was placed in the bottom of a dry branch and covered with sticks and trash in the fall of the year, the season being an ordinary one, it would require four or five months for the body to become sufficiently decomposed for the head, legs and arms to drop off by the movement of the body. If the body was subject to the action of water it would require a somewhat longer time for decomposition to advance to the stage described in this case. Dr. Thurston, for the defense, testified as did Dr. Wray, except that the period named by him as necessary for decomposition to have advanced to the stage

indicated by the evidence in this case was six months. The last witness thought that the coat would have rotted away before the ligaments connecting the arms and the body would. Crows and buzzards, if able to get to the neck, might have so eaten it as to separate the head from the trunk.

Mrs. M. A. Work, the mother of the defendant, and mother-in-law of W. C. Jump, was the next witness for the defense. According to her narrative she and her family, including the defendant, left their home in Bosque county, in September, 1887, in consequence of the total failure of crops, and went to Ellis county, where Jump was at work. They were joined near Waco by Spears, who asked to be taken along as far as witness's party should go, agreeing to take care of the stock for his food. He told witness that he was out of money, having but twenty-five cents, and was making his way to the Indian Territory. He was riding a small gray pony, and was very poorly dressed. Reaching a point near Waxahachie, where Jump was at work, the entire party picked cotton for a few days, and then went on to Dallas county, Jump and his wife going with them. In Dallas county the party first picked cotton for Porter, then for Adams, and then for Anderson. Spears boarded with the witness during the entire time, except when he worked for Adams, and he and defendant got to be good friends.

A few days before the day on which Spears disappeared, he came to witness's camp, and said that he had seen a sheriff in the next field, and that, as he had been charged elsewhere with fence cutting and other crimes, and did not propose to be "hemmed up," he would not sleep in camp again. Accordingly that night he took his blankets, and went to the field some distance from the camp. He expressed great uneasiness and declared his anxiety to get on to the Territory. On the evening before he left he told witness that he was going to Embree, and that, if he found a letter he was expecting at Embree, he would not return. At the same time he instructed witness to collect some money due him from Adams, and apply it to his board and washing. He also traded horses with defendant, getting thirty-five dollars to boot. Jump came back to camp on the evening of the day the three men left camp (October 25, 1887), and defendant came on the evening of the following day. On the following Saturday witness and her family and Jump went to Terrell, where witness rented land. Defendant

then went to Brown county to look after a farm owned by witness. Losing his horse in Brown county, he went to his uncle's place in Mason county to work with him. The coat found on the dead body was here exhibited to witness, and she declared positively and emphatically that it was not Spears's coat, and had never been worn by him, though in color and texture it somewhat resembled his coat. Witness had often had Spears's coat in her hands, mending it, and she knew where all the rents were. There was not a rent in this coat corresponding with a single one in Spears's coat.

C. S. Hays testified, for the defense, that he was familiar with the reputation of defendant as a law abiding, honest citizen, in Bosque county, since his, defendant's, childhood, and that it was good.

*Fitzhugh & Wozencraft, Smith & Obenchain,* and *Kenneth Foree,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

HURT, JUDGE. This conviction was for murder of the second degree with the penalty fixed at five years in the penitentiary.

The State challenged the proposed juror Bailey for cause, upon the ground that he had served one week on the jury in the district court of Dallas county within the past six months. Bailey had served five days during a week. The court sustained the challenge, and counsel for appellant excepted and reserved his bill. The learned judge appends to the bill this explanation: "Defendant never exhausted his peremptory challenges."

The juror was not disqualified under article 3010, Revised Statutes (Thompson v. The State, 19 Texas, Ct. App., 593.) But "appellant did not exhaust his challenges." If he had exhausted every challenge allowed him by law, Bailey would not have been restored to competency as a venireman. Bailey being a competent juror, the State should have been compelled to challenge him either for cause or peremptorily.

The indictment alleges that appellant shot and killed deceased "with a weapon to the grand jurors unknown." If the pleader had alleged a gun as the weapon, under such allegation proof that deceased was shot with any character of fire arms would have been competent. But, having omitted to name the

weapon, the State introduced evidence to prove diligence on the part of the grand jury to ascertain the character of the weapon—that is, whether a gun or a pistol, we suppose; and the county attorney propounded this question to the foreman of the grand jury: "What effort, if any, did you make to learn the manner and cause of the death of the deceased, and what conclusion did you arrive at?" The witness answered: "We had a great many witnesses before the grand jury, and we returned this indictment, which we thought was right." Counsel for appellant objected to the question and also to the answer.

We are of opinion that the objection to the question was well taken; because, if it was the purpose of the State to show that the grand jury had used the necessary diligence to ascertain the weapon (whether gun or pistol) with which the deceased had been killed, then the question was too broad—too comprehensive—and was clearly calculated to elicit the answer given by the witness, and which answer was most evidently incompetent and very prejudicial to the accused. If the State desired to show diligence on the part of the grand jury to learn whether deceased was shot with a gun or pistol, the witness should have been asked what efforts, if any, did you make to ascertain the fire-arm with which the deceased was killed? Such a question could have been answered without danger to the rights of the accused; the witness would be confined to the diligence regarding the weapon.

The indictment alleging that the deceased came to his death by being shot, the State was bound to prove this to be true, and this fact must be proved by competent and not hearsay evidence. Over objection of defendant the State proved by the witness Alexander that he was justice of the peace in the precinct in which the body which was supposed to be that of Calvin Spears was found, at the time that said body was found, and that he held an inquest over said body, and that he and and the jury of inquest examined a great many witnesses at said inquest, and searched the ground near where the body was found for weapons, and from the hole in the head and the appearance of the body, and the testimony of witnesses, it appeared that deceased came to his death from being shot.

This testimony is obnoxious to two objections. 1. A part of it is hearsay. 2. A part is the opinion of the witness, the re-

sult of an investigation to which the appellant was in no manner a party.

Appellant's last assignment of error is that the verdict is not supported by the evidence. In this we think counsel for appellant is correct. We are not willing to sanction, and allow to serve as a precedent, a verdict founded upon such vague and inconclusive facts. (The Reporter will give the facts in full.)

For the reasons noted above, the judgment is reversed and the cause remanded for another trial.

*Reversed and remanded.*